**MONTEVERDE & ASSOCIATES PC**
David E. Bower   SBN 119546
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Telephone:  (213) 446-6652
Direct:  (310) 210-0605
Facsimile:  (212) 601-2610
*Attorneys for Plaintiff William Baker*

**ADEMI & O'REILLY, LLP**
Shpetim Ademi
John D. Blythin
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com
*Attorneys for Plaintiff Curtis Bentley*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MIDLAND CREDIT MANAGEMENT, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION | CASE NO. 11-md-2286-MMA (MDD) Member cases: 16-cv-2157; 16-cv-2768 |
| CURTIS BENTLEY, WILLIAM BAKER, and EMIR FETAI, Individually and on Behalf of All Others Similarly Situated, | **SECOND CONSOLIDATED AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC., | |
| Defendants. | |

Plaintiffs Curtis Bentley, William Baker, and Emir Fetai, individually and on behalf of all

others similarly situated, bring this action seeking redress for business practices that violate the

Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et seq*. ("TCPA"). Defendants

- 1 -

Midland Credit Management, Inc. ("MCM"), Midland Funding LLC, ("Midland Funding") and Encore Capital Group, Inc. ("Encore"), violated the TCPA by contacting Plaintiffs on their cellular telephones via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or by using "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A), without Plaintiffs' prior express consent within the meaning of the TCPA. Plaintiffs allege on personal knowledge, the investigation of counsel, and on information and belief as follows:

## NATURE OF ACTION

1.       Plaintiffs bring this action for damages, and other legal and equitable remedies, resulting from the illegal actions of Defendants in contacting Plaintiffs and Class members on their cellular telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. (hereinafter referred to as the "TCPA").

2.       Defendants violated the TCPA by contacting Plaintiffs and Class members on their cellular telephones via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or by using "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A), without their prior express consent within the meaning of the TCPA.

3.       Defendants settled similar TCPA claims in this MDL on a class-wide basis for approximately $20.6 million. https://www.midlandtcpasettlement.com/ Home.aspx. The class period for the settlement is from November 2, 2006 through August 31, 2014, inclusive. *Id.*

4.        Despite the settlement, Defendants have apparently not changed their practices to cease placing autodialed calls to cellular telephones without consent. Plaintiffs Bentley, Baker, and Fetai received autodialed telephone calls from Defendants on cellular phones without providing the phone number to Defendants.

5.       Plaintiffs thus seek to certify a class of individuals who received ATDS calls from Defendants without consent, beginning on September 1, 2014, after the settlement class period closed.

6.      Plaintiffs bring this action for injunctive relief and statutory damages resulting from Defendants' illegal actions.

## JURISDICTION AND VENUE

7.      The court has jurisdiction to grant the relief sought by the Plaintiffs pursuant to 15 U.S.C. § 1692k, 28 U.S.C. §§ 1331 and 1337; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have federal question jurisdiction over TCPA claims.).

8.      This Court has personal jurisdiction over Defendants because Defendants reside in and maintain their principal office in this district. Defendant has established minimum contacts showing it has purposefully availed itself to the resources and protection of the State of California. Defendant does substantial business in California.

9.      Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a) because Defendants conduct business in the County of San Diego, and have their primary corporate headquarters within this judicial district. Further, a substantial part of the events giving rise to the claims, namely automated telephone calls to consumers originated in this District.

## PARTIES

10.      Plaintiff Curtis Bentley ("Bentley") is an individual citizen of the State of Wisconsin, who resides in Belgium, Wisconsin.

11.      Plaintiff William Baker ("Baker") is an individual citizen of the State of Wisconsin, who resides in Waukesha, Wisconsin.

12.      Plaintiff  Emir Fetai ("Fetai") is an individual citizen of the State of Wisconsin, who resides in Kenosha, Wisconsin.

13.     Defendant Midland Credit Management, Inc. ("MCM") is a debt collection agency with its principal offices located at 3111 Camino Del Rio North, Suite 103, San Diego, CA 92108.

14.     MCM is engaged in the business of a collection agency, using the mails and telephone to collect charged off consumer debts originally owed to others.

15.     MCM is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes.

16.     Defendant Midland Funding LLC, ("Midland Funding") is a Delaware limited liability company with its principal place of business located at 8875 Aero Drive, Suite 200, San Diego, CA, 92123.

17.     Midland Funding is engaged in the business of taking title to charged-off consumer debts, including credit card, auto deficiency and telecom receivables purchased from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios. (Encore's SEC filing on form 10-Q, Aug. 8, 2008).

18.     A company meeting the definition of a "debt collector" (here, Midland Funding) is vicariously liable for the actions of a second company collecting debts on its behalf. *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325-26 (7th Cir. 2016) (assignees who are "debt collectors" are responsible for the actions of those collecting on their behalf); *citing Pollice*, 225 F.3d at 404-05.

19.     MCM and Midland Funding Corporation are under common ownership.

20.     Both are direct or indirect subsidiaries of Defendant Encore Capital Group, Inc. ("Encore"), a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

21.     Encore raises money in public securities markets to acquire the debts which are transferred to Midland Funding or other similar entities and collected by MCM. Encore also is responsible for the overall collection strategies used to collect the accounts.

22.     Encore's webpage states:

If you are one of our consumers, you probably know us as <u>Midland Credit Management</u> (or MCM). Midland Credit Management, a subsidiary of Encore Capital Group, works with consumers to resolve past-due obligations. MCM services accounts after the originating creditor has charged-off the account.
...

If you have heard from MCM, your obligation to a lender is now your obligation to Midland Funding, LLC. Please give us a call at 1-877-240-2377 or visit online to learn about your options or discuss your account.
Please understand that Midland Credit Management is a debt collector. Midland Credit Management's communications with consumers are an attempt to collect a debt. Any information we obtain will be used for that purpose.

23.     Encore is one of the largest debt buyers and debt collectors in the industry, with consumer debt portfolios in the hundreds of millions of dollars. Encore's 2013 10-K filing states that Encore has "one of the industry's largest financially distressed consumer databases." (Form 10-K, 12/31/13, p. 2).

24.     Encore purchased similar amounts of U.S. consumer credit card accounts in 2012 and 2011 and has purchased similar amounts each year from 2013 to the present.

25.     Encore describes itself as "a leading accounts receivable management firm" (Encore Capital Group Inc., Exhibit 99.1, filed with the SEC on March 15, 2006) and a "purchaser and manager of charged-off consumer receivables portfolios" (Encore Capital Group Inc., Form 424B3, filed March 1, 2011, prospectus summary).

26.     On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios" (Form 8-K filed by Encore with the SEC on March 10, 2005).

27.     "From inception through December 31, 2010, we have invested approximately $1.8 billion to acquire 33.0 million consumer accounts with a face value of approximately $54.7 billion" (Form 10-K filed by Encore with the SEC for the year ending December 31, 2010, original p. 1).

28.     Encore states that it is responsible for developing collection strategies. Its Form 10-K for the year ending December 31, 2010 states: "We expand and build upon the insight developed during our purchase process when developing our account collection strategies for portfolios we have acquired. Our proprietary consumer-level collectability analysis is the primary determinant of whether an account is actively serviced post-purchase. Throughout our ownership period, we periodically refine this analysis to help determine the most effective collection strategy to pursue for each account" (Original page 4).

29.     Among these strategies are outbound telephone calls. "During 2010, we called approximately 8.6 million unique consumers, of which 1.8 million, or 21%, made contact with us" (Encore Capital Group, Inc. report on SEC Form 10-K for the year ending December 31, 2010, original page 4).

30.     Similarly, in its Prospectus filed with the SEC on March 1, 2011, Encore Capital Group, Inc., stated ("Prospectus Summary"):

> We are a systems-driven purchaser and manager of charged-off consumer receivable portfolios . . . We acquire receivable portfolios at deep discounts from their face values using our proprietary valuation process that is based upon an analysis of the individual consumer attributes of the underlying accounts. Based upon our ongoing analysis of these accounts, we employ a dynamic mix of collection strategies to maximize our return on investment. . . . Acquisitions of receivable portfolios are financed from operating cash flows and borrowings from third parties. . . .
>
> We have been in the collection business for 56 years and started purchasing portfolios for our own account approximately 19 years ago. . . .
> We have established certain relationships with credit card issuers, other lenders and resellers that allow us to purchase portfolios directly through negotiated transactions, and we participate in the auction-style purchase processes that typify our industry. In addition, we enter into "forward flow" arrangements in which we agree to buy receivables that meet agreed upon parameters over the course of the contract term.

> We evaluate each portfolio for purchase using the proprietary valuation and underwriting processes developed by our in-house team of statisticians. Unlike many of our competitors, which we believe primarily base their purchase decisions on numerous aggregated portfolio-level factors, including the originator, the type of receivables to be purchased, or the number of collection agencies the accounts have been placed with previously, we base our purchase decisions primarily on our analysis of the specific accounts included in a portfolio. Based upon this analysis, we determine a value for each account, which we aggregate to produce a valuation of the entire portfolio. We believe this capability allows us to perform more accurate valuations of receivable portfolios. We have successfully applied this methodology to receivables across multiple asset classes.
>
> After we purchase a portfolio, we continuously refine our analysis of the accounts to determine the best strategy for collection. As with our purchase decisions, our collection strategies are based on account level criteria. Our collection strategies include: . . .
> * outbound calling, driven by proprietary, predictive software, by our own collection workforce located at our three domestic call centers and our international call center in India; ....

31.     According to Encore's 2013 Form 10-K, Encore *spent* more than $525 million to purchase consumer credit card accounts in the U.S. The face value of those accounts is in the tens of billions of dollars.

32.     Moreover, Encore acquires portfolios for an average of approximately four cents on the dollar.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

## (TCPA), 47 U.S.C. § 227

33.     In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices.

34.     The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call, including sending a text message, to a wireless number in the absence of an emergency or the prior express written consent of the called party.

35.     According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls and texts whether they pay in advance or after the minutes are used.

36.     The FCC has ruled that the word "call" in the TCPA includes both voice calls and text calls, and applies whether the text messages were sent by regular telephone transmission or over the internet to a wireless device. "TCPA Omnibus Declaratory Ruling and Order," FCC 15-72 at 56-62 (July 10, 2015), (available at "https://www.fcc.gov/document/tcpa-omnibus-declaratory-ruling-and-order.") (Reaffirming the FCC's 2003 ruling that text messages are "calls" under the TCPA and further ruling that text messages sent "internet to phone" and by other sources are also "calls.")

37.     The TCPA "generally prohibits autodialed calls to wireless phones," but "provides an exception for autodialed and prerecorded message calls...made with the prior express consent of the called party." *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 512 (E.D. Wis. 2014) citing *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559 ¶ 9 (Jan. 4, 2008); 47 U.S.C. § 227(b)(1)(A)(iii).

38.     On February 15, 2012, the FCC released a Declaratory Ruling wherein it clarified that a party must obtain ***prior express written consent*** from the recipient prior to making automated calls to the recipient's cellular telephone. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2012 FCC Declaratory Ruling"), 27 F.C.C.R. 1830, 27 FCC Rcd. 1830, 55 Communications Reg. (P&F) 356, 2012 WL 507959 (Feb, 15, 2012), at ¶ 2.

39.     The FCC recently updated its rules on consent, requiring "prior express written consent" for calls or SMS text messages that contain an "advertisement" or "telemarketing." *See* 47 C.F.R. § 64.1200(f)(8).

40.     In the same omnibus order, the FCC clarified "that a called party may revoke consent at any time and through any reasonable means. A caller may not limit the manner in which revocation may occur." TCPA Omnibus Declaratory Ruling and Order," FCC 15-72 at 29-30.

41.     The Court is bound by all of the FCC's final orders relating to the TCPA. *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, footnote 4 (E.D. Wis. 2014) citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding); *Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding).

42.     After MCM's first calls to Plaintiffs' wireless phones, MCM had actual or constructive knowledge that Plaintiffs' wireless telephone numbers were assigned to Plaintiffs and not another person. "TCPA Omnibus Declaratory Ruling and Order," FCC 15-72 at 40:

> We clarify, however, that callers who make calls without knowledge of reassignment and with a reasonable basis to believe that they have valid consent to make the call should be able to initiate one call after reassignment as an additional opportunity to gain actual or constructive knowledge of the reassignment and cease future calls to the new subscriber. If this one additional call does not yield actual knowledge of reassignment, we deem the caller to have constructive knowledge of such.

43.     The Court is bound by all of the FCC's final orders relating to the TCPA. *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, footnote 4 (E.D. Wis. 2014) citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding); *Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding).

## **FACTUAL ALLEGATIONS**

44.     At all times relevant, each Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

45.     Defendants sought to collect debts that arose from transaction incurred allegedly for personal, family or household purposes. Specifically, consumer credit cards.

46.     Each Plaintiff only had personal, non-business credit card accounts. Each Plaintiff opened and used such credit cards for personal use, namely, purchases of household goods and services.

47.     Upon information and belief, the original creditor sold each Plaintiff's account to MCM's related company, Midland Funding, LLC ("Midland Funding"), after the account was in default.

48.     MCM is one of the largest debt buyers and debt collectors in the industry, with consumer debt portfolios in the hundreds of millions of dollars. The 2013 10-K filing for MCM's parent company, Encore Capital Group ("Encore"), states that Encore has "one of the industry's largest financially distressed consumer databases." (Form 10-K, 12/31/13, p. 2).

49.     According to Encore's 2013 Form 10-K, Encore *spent* more than $525 million to purchase consumer credit card accounts in the U.S. As MCM paid less than 10 cents on the dollar, the face value of those accounts is in the tens of billions of dollars. Encore purchased similar amounts of U.S. consumer credit card accounts in 2012 and 2011.

50.     MCM uses at least one "automatic telephone dialing system" which the Ninth Circuit has defined as "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person)." 47 U.S.C. § 227(a)(1); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018).

51.     MCM placed autodialed calls consumers from call centers in the United States, India and Costa Rica. Encore's 2018 Form 10-K states:

Call Centers. We maintain domestic collection call centers in Phoenix, Arizona, St. Cloud, Minnesota, Troy, Michigan, and Roanoke, Virginia and international call centers in Gurgaon, India and San Jose, Costa Rica.

Encore 10-K at 5, filed February 21, 2018, *available at* https://www.sec.gov/Archives/edgar/data/1084961/000108496118000013/ecpg-20171231x10k.htm.

52. MCM uses at least one "Predictive Dialer" as defined by the Federal Commutation Commission ("FCC").

53. On information and belief, MCM's Predictive Dialer is capable of dialing telephone numbers without human intervention.

54. MCM's Predictive Dialer is capable of delivering an automated prerecorded message.

55. Upon a phone call being answered by a live person, MCM's Predictive Dialer has the capability of transferring that phone call to a live operator.

56. Upon information and belief, all calls that Defendants placed to Plaintiffs' cellular telephone numbers were made using a predictive dialer or other system that qualifies as an ATDS.

57. Upon information and belief, all calls that Defendants placed to class members' cellular telephone numbers were made using a predictive dialer or other system that qualifies as an ATDS.

### *Defendants' Unsolicited Calls to Bentley's Cellular Phone*

58. Bentley obtained a new telephone number in or around July 2015.

59. Bentley never provided his new cellular telephone number, ending in 7989, to MCM or to the original creditor or any agent or employee of either.

60. Bentley never provided MCM with express consent to receive prerecorded or automated calls by Defendant on Bentley's cellular telephone.

61.     Bentley did not provide his cellular telephone number to the original creditor "during the transaction that resulted in the debt owed" because Plaintiff had a different cellular telephone number at the time he applied for any credit cards.

62.     Beginning in or around July 2016, MCM began calling Bentley's cellular telephone in connection with an alleged debt owed to Defendants. These calls were made to Bentley's cellular telephone number, and consisted of repeated autodialed and/or prerecorded calls.

63.     Defendant MCM called Bentley's cellular phone on the following dates, attempting to collect an alleged debt allegedly owed to Midland Funding:

July 23, 2016,

July 25, 2016,

July 28, 2016, and

July 30, 2016.

64.     As of August 5, 2016, Bentley has not received an initial written communication from MCM regarding the alleged debt that MCM was attempting to collect in the July phone calls.

65.     Defendant is, and at all times mentioned herein was, a "person", as defined by 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation.")

66.     All telephone contact by Defendant to Bentley on his cellular telephone occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A).

67.     The telephone number that Defendants used to contact Bentley, with an "artificial or prerecorded voice" and/or made by an "automatic telephone dialing system," was assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

68.     Bentley did not provide "prior express consent" allowing Defendants to place telephone calls to Bentley's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," within the meaning of 47 U.S.C. § 227(b)(1)(A).

69.     Upon information and belief, MCM obtained Bentley's cellular telephone number through skip-tracing.

70.     Defendant's telephone calls to Bentley's cellular phone were not "for emergency purposes" as described in 47 U.S.C. § 227(b)(1)(A).

71.     Defendant's telephone calls to Bentley's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system" for non-emergency purposes and in the absence of Bentley's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

72.     Under the TCPA, the burden is on Defendant to demonstrate that Bentley provided prior express consent within the meaning of the statute.

73.     The "'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *see also Osorio v. State Farm Bank*, F.S.B., 746 F.3d 1242, 1251-52 (11th Cir. 2014) ("called party" means the current subscriber and not the prior subscriber or intended recipient for purposes of the TCPA).

### *Defendants' Unsolicited Calls to Baker's Cellular Phone*

74.     Baker has a cellular telephone assigned the telephone number XXX-XXX-9932. The first six digits of Plaintiff's cellular telephone number are redacted for privacy considerations.

75.     Baker is the regular user of the cellular telephone and it is generally carried on his person.

76.     Baker did not provide his cellular phone number to the original creditor of the debt MCM was attempting to collect – Citibank, N.A.

77.     Baker obtained the new telephone number, ending in 9932 after his Sears-branded Citibank credit card account was charged off and sold to Midland Funding.

78.     Baker never provided his new cellular telephone number, ending in 9942, to MCM, Midland Funding, Encore or to the original creditor or any agent or employee of any of these entities.

79.     Baker never provided MCM with express consent to receive prerecorded or automated calls by Defendant on Baker's cellular telephone.

80.     Baker did not provide his cellular telephone number to Sears or Citibank "during the transaction that resulted in the debt owed" because Plaintiff had a different telephone number at the time he applied for the credit card.

81.     Beginning in or around July 2016, MCM began calling Baker's cellular telephone in connection with an alleged debt owed to Defendants. These calls were made to Baker's cellular telephone number, and consisted of repeated autodialed and/or prerecorded calls.

82.     MCM's calls were placed from 800-201-8370 and 877-209-4493.

83.     Defendant MCM called Baker's cellular phone at the following dates and times, attempting to collect an alleged debt allegedly owed to Midland Funding:

July 2, 2016, 8:10 AM

July 3, 2016, 8:07 AM

July 5, 2016, 8:20 AM

July 6, 2016, 9:38 AM

September 8, 2016, 8:32 AM

September 9, 2016, 10:07 AM

84.     Each Defendant is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation.")

85.     All telephone contact by Defendants to Baker on his cellular telephone occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A).

86.     The telephone number that Defendants used to contact Baker, with an "artificial or prerecorded voice" and/or made by an "automatic telephone dialing system," was assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

87.     On information and belief, each phone call placed to Plaintiff by MCM was with the use of a Predictive Dialer, without a human hand manually dialing the telephone number.

88.     Baker did not provide "prior express consent" allowing Defendants to place telephone calls to Baker's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," within the meaning of 47 U.S.C. § 227(b)(1)(A).

89.     Upon information and belief, MCM obtained Baker's cellular telephone number through skip-tracing.

90.     Defendant's telephone calls to Baker's cellular phone were not "for emergency purposes" as described in 47 U.S.C. § 227(b)(1)(A).

91.     Defendant's telephone calls to Baker's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system" for non-emergency purposes and in the absence of Baker's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

92.     Under the TCPA, the burden is on Defendants to demonstrate that Baker provided express consent within the meaning of the statute.

93.     The Seventh Circuit has held that the "'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *see also Osorio v. State Farm Bank*, F.S.B., 746 F.3d 1242, 1251-52 (11th Cir. 2014) ("called party" means the current subscriber and not the prior subscriber or intended recipient for purposes of the TCPA).

### *Defendants' Unsolicited Calls to Fetai's Cellular Phone*

94.     Fetai opened his "Menards"-branded credit card in or around 2014 or 2015, at a Menards retail store.

95.     Menards is a regional retail store, located primarily in Midwest. Its website states:

> Menards® is headquartered in Eau Claire, Wisconsin and has more than 300 home improvement stores located in Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin and Wyoming.

96.     Menards contracts with Capital One, which issues a Menards-branded credit card called the "Big Card."

97.     The "Capital One® Customer Agreement" applicable to Menards Big Card accounts does not contain an arbitration agreement.

98.     Capital One's consumer credit card accounts do not contain arbitration agreements. *See* Bahney, Anna. "Does your credit card force you to give up your rights?" CNN Money, Nov. 30, 2017, available at https://money.cnn.com/2017/11/30/pf/arbitration-credit-cards/index.html ("Of the 30 issuers, representing 99% of all U.S. consumer card balances, nine did not have a forced arbitration clause including some of the biggest, including, Chase, Bank of America and Capital One.").

99.     Fetai opened and used his Menards Big Card account for the purpose of purchasing personal and household goods at Menards stores, and not any commercial purpose.

100.    Menards offers two different commercial credit accounts other than the consumer Big Card – a "Contractor Card," intended for small businesses, and a "Commercial Account" intended for "large companies and nonprofit organizations." Plaintiff's account was a consumer account.

101.    Upon information and belief, one or more of Defendants – Encore and/or Midland Funding – purchased Fetai's Menard's account from Capital One sometime in 2017.

102.    Fetai obtained his cell phone number in or around 2007 or 2008.

103.    Fetai never provided his new cellular telephone number, ending in 2915, to MCM.

104.    Fetai never provided MCM with express consent to receive prerecorded or automated calls by Defendant on Fetai's cellular telephone.

105.    At some point in the last two years, Fetai's father, Ilaz Fetai, opened a "Boston Store" consumer credit card account at a Boston Store retail store.

106.    Fetai was not present when his father opened the Boston Store account. If he had been there, Fetai would have attempted to talk his father out of opening the account.

107.    Boston Store was a department store chain owned by The Bon-Ton stores ("Bon-Ton"). Boston Store was founded in 1897 in Milwaukee, Wisconsin. Bon-Ton entered bankruptcy in February 2018. All of the brick and mortar stores closed in 2018, and Bon-Ton's assets were liquidated in 2018.

108.    Prior to its parent's bankruptcy, Boston Store contracted with Comenity, which issued Boston Store consumer credit card accounts.

109.    As Fetai's father, and not Fetai, opened the Boston Store account, Fetai had no contractual relationship with Comenity regarding the Boston Store account.

110.    Upon information and belief, beginning in 2017, MCM began calling Fetai's cellular telephone in connection with the alleged Capital One and Comenity. These calls were made to Fetai's cellular telephone number and consisted of repeated autodialed and/or prerecorded calls.

111.   Fetai did not answer most of MCM's calls.

112.   In or around April or May 2018, MCM called Fetai regarding Fetai's father's Boston Store account.

113.   On that call, Fetai spoke with a MCM representative. Fetai told the MCM representative that the Boston Store account was not his but was his father's account. The MCM representative told Fetai that MCM could not discuss his father's account with Fetai.

114.   Upon information and belief, MCM also called Fetai several times in April or May 2018 about his Menards account.

115.   Defendant is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation.")

116.   All telephone contact by Defendant to Fetai on his cellular telephone occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and/or used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A). *See Marks*, 904 F.3d at 1053.

117.   The telephone number that Defendants used to contact Fetai, with an "artificial or prerecorded voice" and/or made by an "automatic telephone dialing system," was assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

118.   Fetai did not provide "prior express consent" allowing Defendants to place telephone calls to Fetai's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," within the meaning of 47 U.S.C. § 227(b)(1)(A).

119.   Upon information and belief, MCM obtained Fetai's cellular telephone number through skip-tracing.

120.   Defendant's telephone calls to Fetai's cellular phone were not "for emergency purposes" as described in 47 U.S.C. § 227(b)(1)(A).

- 18 -

121.    Defendant's telephone calls to Fetai's cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system" for non-emergency purposes and in the absence of Fetai's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

122.    Under the TCPA, the burden is on Defendant to demonstrate that Fetai provided prior express consent within the meaning of the statute.

123.    The Seventh Circuit has held that the "'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *see also Osorio v. State Farm Bank*, F.S.B., 746 F.3d 1242, 1251-52 (11th Cir. 2014) ("called party" means the current subscriber and not the prior subscriber or intended recipient for purposes of the TCPA).

## COUNT I

### KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ*.

124.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Consolidated Amended Complaint as if fully stated herein.

125.    The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

126.    As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and each member of the Class are entitled to treble damages of up to $1,500.00 for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

127.    Plaintiffs and all Class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendants in the future. Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## COUNT II

### VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ.*

128.   Plaintiffs incorporate by reference the foregoing paragraphs of this Second Consolidated Amended Complaint as if fully set forth herein.

129.   The foregoing acts and omissions of Defendants constitute numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

130.   As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and Class members are entitled to an award of $500.00 in statutory damages for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

131.   Plaintiffs and Class members are also entitled to and do seek injunctive relief prohibiting Defendant's violation of the TCPA in the future.

132.   Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs.

### CLASS ACTION ALLEGATIONS

133.   Plaintiffs bring this action on behalf of themselves and on behalf of a class of persons similarly situated, defined as:

> All persons within the United States who, on or after September 1, 2014, received a non-emergency telephone call from or on behalf of MCM to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice, and who either did not provide their cellular telephone number to the alleged creditor or who revoked prior express consent to contact the person's cellular phone.

Plaintiffs Bentley, Baker, and Fetai represent, and are members of, the Class. Excluded from the Class are Defendants and any entities in which any Defendant has a controlling interest; Defendants' agents and employees; any Judge to whom this action is assigned, any member of such

Judge's staff and immediate family; any claims for personal injury, wrongful death and/or emotional distress; any individual who opted out of the prior Midland TCPA MDL class settlement; and any individual who notifies Interim Lead Class Counsel in writing, between the filing of this consolidated amended complaint and the opt out deadline of any certified class, that they want to proceed on an individual basis.

134.    Plaintiffs do not know the exact number of members in the Class, but Plaintiffs reasonably believe that Class members number, at minimum, in the tens of thousands.

135.     Plaintiffs and all members of each Class have been harmed by the acts of Defendants.

136.    This Second Amended Class Action Complaint seeks injunctive relief and money damages.

137.    The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified easily through records maintained by Defendants and/or its agents.

138.    There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact involving the class claims predominate over questions which may affect individual Class members. Those common questions of law and fact include, but are not limited to, the following:

a.    Whether Defendants and/or their agents made non-emergency calls to Bakers', Bentley's, Fetai's, and Class members' cellular telephones using an automatic telephone dialing system and/or an artificial or prerecorded voice;

b.    Whether Defendants and/or its agents utilized "skip tracing" methods to locate the cellular telephone numbers of non-customers;

    c.   Whether Defendants can meet their burden of showing they obtained prior express consent (*i.e.*, consent that is clearly and unmistakably stated), to make such calls;

    d.   Whether Defendants' conduct was knowing and/or willful;

    e.   Whether Defendants are liable for damages, and the amount of such damages; and

    f.   Whether Defendants should be enjoined from engaging in such conduct in the future;

139.    Plaintiffs assert claims that are typical of each Class member. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have no interests which are antagonistic to any member of the Class.

140.    Plaintiffs have retained counsel experienced in handling class action claims involving violations of federal and state consumer protection statutes, including claims under the TCPA.

141.    A class action is the superior method for the fair and efficient adjudication of this controversy. Class-wide relief is essential to compel Defendants to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the statutory damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize calls to their cellular telephones.

142.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiffs allege that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

## **JURY DEMAND**

143.    Plaintiffs hereby demand a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against Defendants:

A.    Injunctive relief prohibiting such violations of the TCPA by Defendant in the future;

B.    As a result of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiffs Bentley, Baker, and Fetai seek for themselves and each Class member treble damages, as provided by statute, of up to $1,500.00 for each and every call that violated the TCPA;

C.    As a result of Defendants' violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member $500.00 in statutory damages for each and every call that violated the TCPA;

D.    An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

E.    An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing appropriate Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Classes, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Classes;

F.    Such other relief as the Court deems just and proper.

Date: December 11, 2018                          Respectfully submitted,

**ADEMI & O'REILLY, LLP**                    **MONTEVERDE & ASSOCIATES PC**
Shpetim Ademi                                    By: */s/ David E Bower*
John D. Blythin                                  David E. Bower  SBN 119546
3620 East Layton Avenue                          600 Corporate Pointe, Suite 1170
Cudahy, WI 53110                                 Culver City, CA 90230
(414) 482-8000                                   Tel: (310) 446-6652
(414) 482-8001 (fax)                             Dir: (310) 210-0605
jblythin@ademilaw.com                            Fax: (212) 601-2610

- 23 -

1

*Co-Lead Class Counsel*

2

3

4

5

6

7

8

Email: dbower@monteverdelaw.com

Juan E. Monteverde
Miles D. Schreiner
MONTEVERDE & ASSOCIATES PC
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10018
Telephone: (212) 971-1341
Facsimile: (212) 601-2610
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*Co-Lead Class Counsel*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND CONSOLIDATED AMENDED COMPLAINT

1

**CERTIFICATE OF SERVICE**

2    I, David E. Bower, hereby certify that a copy of the foregoing CONSOLIDATED AMENDED COMPLAINT and this Certificate of Service is being filed via this Court's CM/ECF system and

3    served by First Class Mail and email on October 20, 2017, to the following:  (if any)

4

5

/s/ David E. Bower          

6                                                   David E. Bower

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND CONSOLIDATED AMENDED COMPLAINT